Lu, John T., J.
INTRODUCTION
The defendant, Jonathan Chadwick (Mr. Chadwick), is charged with assault and battery by means of a dangerous weapon and aggravated assault and batteiy. Mr. Chadwick moves to suppress recordings (Jailhouse Recordings) of telephone calls he made while awaiting trial in the custody of the Essex County Sheriffs Department (Sheriffs Department) at the Essex County Correctional Facility in Middleton, Massachusetts (Middleton).[1] Mr. Chadwick contends that the Jailhouse Recordings were obtained in violation of his state and federal constitutional rights to be free from unreasonable searches and seizures because they were obtained without a warrant, subpoena, court order, or other legal process. The court conducted an evidentiaiy hearing on this issue.
The court concludes that Mr. Chadwick had no objectively reasonable expectation of privacy in the Jailhouse Recordings because the participants in the telephone conversations repeatedly discussed the Middleton Jail’s practice of tape recording prisoner phone calls, all parties “ha[d] notice that the calls [were] subject to monitoring and recording, and further, . . . the recording and monitoring [was] justified by legitimate penological interests.” Matter of a Grand Jury Subpoena, 454 Mass. 685, 685 (2009). The court denies the motion to suppress.[2]
FINDINGS OF FACT
Based on the evidence presented and reasonable inferences drawn from the evidence, the court makes the following findings of fact:
1. On April 11,2009, Justin Goodwin (Mr. Goodwin) went with his sister, Kalem Goodwin (Ms. Goodwin), *158 and her boyfriend, Pietro Favazza (Mr. Favazza), to the Old Timer’s Tavern in Gloucester, Massachusetts.
2. While in the bar, Ms. Goodwin and later, Mr. Goodwin, became involved in a fight or attack.
3. Bar security escorted Mr. Goodwin, Ms. Goodwin, and Mr. Favazza out of the bar through a side exit that emptied into an alley.
4. After Mr. Goodwin, Ms. Goodwin, and Mr. Favazza were removed, they were attacked by several people.
5. Mr. Goodwin suffered multiple fractures of the jaw, a broken eye socket, and serious bruises to his shoulder and back.
6. The defendant was charged in a district court with participation in the attack, and held pretrial at Middleton.
7. Mr. Chadwick made at least twelve telephone calls from Middleton.
8. The twelve calls are the subject of Mr. Chadwick’s motion to suppress.
9. When an inmate placed a call from a Middleton telephone, an automated warning was given to both participants before any conversation could begin.
10. The message stated, “(t]his is a collect call from [inmate’s name], an inmate at the Essex County-Sheriffs Department. To accept charges press ‘0.’ This call is subject to monitoring and recording.”
11. The calls appear to have been between Mr. Chadwick and his girlfriend (Meaghan), his brother’s girlfriend (Brittany), his grandmother, and his girlfriend’s mother.[3]
12. The predominant topics of discussion were romantic issues with his girlfriend, and a flirtation or potential romance with his brother’s girlfriend.
13. The telephone calls also involved intimate and private conversations having to do with Mr. Chadwick’s legal troubles, plans for the future, a few details of legal strategies, bail arrangements, and health issues.
14. Although the calls contained discussions of Mr. Chadwick’s attorney’s advice to him, none of the calls constituted attorney-client communications.
15. None of the calls implicated the attorney-client privilege, spousal privilege or disqualification, or any other privilege or disqualification.
16. Exhibits #2 and #3, copies of an excerpt from the inmate handbook and the Inmate Telephone System Number Request Form, are authentic copies of documents that were given to Mr. Chadwick before the telephone calls.
17. The handbook provides that “(a]ll inmate calls are subject to telephone monitoring, except pre-au-thorized telephone numbers for an attorney.”
18. The request form provides that “acceptance of a PIN and use of the inmate telephones shall be deemed as consent to the conditions and restrictions placed upon inmate telephone calls, including call monitoring, recordings and call detail.”
19. Each document gave Mr. Chadwick notice of the recording and monitoring.
20. All of the participants in the calls were aware they were being tape recorded but either assumed that authorities would not bother to listen to the tapes (as Mr. Chadwick stated in a call), or failed to appreciate how small differences in Mr. Chadwick’s account might assist the prosecution.
21. Call #1 is a very long call from Mr. Chadwick to Meaghan.[4]
22. At page 15, lines 13-15, Mr. Chadwick tells Meaghan to not “say any good news over the phone” or the jail will record it and try to use it.
23. Call #2 is a very long call to Meaghan.
24. Call #3 is a long call to Brittany.
25. Call #4 is a very long call to Brittany.
26. Call #5 is a very long call to Meaghan.
27. It contains repeated and detailed discussions of Middleton’s practice of recording inmate telephone calls at page 3, lines 2-12, page 4, lines 7-9, page 5, lines 2-20, page 11, lines 1-7 and 10-21, page 13, lines 19-25, page 14, lines 12-19, page 19, line 19 through page 20, line 4, and page 23, lines 6-19.
28. Call #6 is a very long call to Brittany.
29. It contains a reference to telephone call recording at page 9, lines 20-22.
30. Call #7 is a brief call to Meaghan’s mother.
31. Call #8 is a call to Mr. Chadwick’s grandmother.
32. Middleton’s policy of tape recording is discussed at page 5, line 11 to page 6, line 10.
33. Call #9 is a very long call to Meaghan.
34. Call #10 is a very long call to Meaghan.
35. Middleton’s recording is discussed at page 2, lines 17-24.
36. Call #11 is a very long call to Brittany.
37. The call is preceded by an automated recording and monitoring warning.[5]
38. Call #12 is a very long call to Brittany.
39. Meaghan, Brittany and Mr. Chadwick’s grandmother each discussed the taping policy with Mr. Chadwick at least once.
40. The only participant that did not do so was Meaghan’s mother.
41. That conversation occupies only three pages of transcript.
42. On April 29, 2009, Gloucester Police Detective Michael Gossom (Detective Gossom) went to the Middleton Jail to listen to the Jailhouse Recordings.[6]
43. Although the calls were recorded for entirely legitimate purposes, including jail security, Detective *159 Gossom only listened to the tapes for the purpose of obtaining evidence to be used in this prosecution.[7]
44. Detective Gossom listened to at least three telephone calls.
45. Detective Gossom did not obtain copies of the Jailhouse Recordings; rather, he summarized the contents of the calls he listened to in a police report a copy of which the defendant has filed with his motion to suppress.
46. Detective Gossom gave a copy of the report to the prosecutor or orally communicated the information to him.[8]
47. On May 28, 2009, the district attorney’s office issued a subpoena to the Sheriffs Department, requesting copies of the Jailhouse Recordings.
48. The prosecutor did not obtain prior judicial approval of the subpoena.
49. The Sheriffs Department’s Director of Communications, Jack Gamble, provided the district attorney’s office with a single compact disk containing copies of the Jailhouse Recordings.
50. The Commonwealth played a portion of Mr. Chadwick’s telephone calls to the grand jury on June 3, 2009.
51. OnJuly 1, 2009, at the request of a grand juror, the Commonwealth provided the grand jury with an unofficial transcript of the portion of the calls played on June 3, 2009.
53. The prosecution wishes to use the taped calls at trial because, during the calls, Mr. Chadwick admitted to being present during the attack, and because he provided some details of his actions.
DISCUSSION
Mr. Chadwick argues that the Commonwealth obtained the Jailhouse Recordings in violation of his rights to privacy and due process, pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and Articles 12 and 14 of the Massachusetts Declaration of Rights, because the Jailhouse Recordings were obtained without a warrant, subpoena, court order, or other legal process.
1. Procedure for Obtaining the Jailhouse Recordings
A party seeking pretrial production of third-party records must file a motion seeking prior judicial approval. Commonwealth v. Lampron, 441 Mass. 265, 270 (2004). This requirement applies equally to both the Commonwealth and defendants. Commonwealth v. Odgren, 455 Mass. 171, 186 (2009) (rejecting Commonwealth’s argument that duty to investigate crimes absolves it from complying with same procedures as defendants with respect to obtaining pre-trial records). Before the Commonwealth may obtain recordings of telephone conversations in the custody of the sheriffs department, it must file a motion seeking judicial approval pursuant to Mass.R.Crim.P. 17(a)(2).[9] Id. at 182-86.
Detective Gossom listened to the Jailhouse Recordings without obtaining a warrant, subpoena, or other judicial approval. But the Commonwealth’s failure to comply with this procedure “does not itself warrant suppression of the [Jailhouse Recordings].” Id. at 189. “[I]n the absence of prejudice, violation of a constitutional right, or statutoiy or common law privilege the [Jailhouse Recordings] [are] admissible.” Commonwealth v. Kastner, 76 Mass.App.Ct. 131 (2010). One issue, then, is whether Mr. Chadwick has demonstrated a violation of a constitutional right (as there is no claim of a violation of a privilege).
2. Constitutional Claims
1. The Fourteenth Amendment and Article 12
The Fourteenth Amendment and Article 12 prohibit the deprivation of a person’s liberty or property rights without due process of law. These rights are not automatically surrendered at the door of a jail, house of correction, or prison. Turner v. Safley, 484 U.S. 78, 84 (1987); Torres v. Commissioner of Corr., 427 Mass. 611, 617 (1998). Nevertheless, a jail or correctional institution may adopt regulations which restrict a detainee’s or inmate’s rights beyond what would be acceptable in the outside community. See Massachusetts Prisoners Ass’n Political Action Comm. v. Acting Governor, 435 Mass. 811, 820 (2001). Any restriction, however, must be “reasonably related to a legitimate penological interest.” Id.
The Supreme Judicial Court has rejected challenges to Department of Correction regulations permitting the monitoring and recording of inmate calls. Cacicio v. Secretary of Public Safety, 422 Mass. 764, 770-72 (1996). The Supreme Judicial Court determined that the regulations served several legitimate penological purposes, including the detection and deterrence of criminal activity “such as planning escapes, organizing drug trafficking, orchestration of criminal activities, solicitations to murder, and fraudulent use of third-parly calls or telephone credit cards,” as well as “preventing] inmates from using telephones to harass members of the media, public officials, and victims ...” Id. at 768,770. The Supreme Judicial Court concluded that the regulations were valid because they were reasonably related to the identified penological purposes. Id. 770-75.
The Sheriffs Department’s policy regarding monitoring and recording telephone calls is very similar to the regulations at issue in Cacicio. The same penological interests support the Sheriffs Department’s policy. The Sheriffs Department’s policy is also reasonably related to those penological interests. The Sheriff s Department’s policy and the recording of Mr. Chadwick’s telephone calls did not violate his due process rights.
*160 2. The Fourth Amendment and Article 14
The Fourth Amendment and Article 14 protect a person’s right to be free from unreasonable searches and seizures. To prevail on this claim, Mr. Chadwick must establish that he had an objectively reasonable expectation of privacy in the Jailhouse Recordings at the time the recordings were made. Commonwealth v. Blood, 400 Mass. 61, 68 (1987), quoting Katz v. United States, 389 U.S. 347 (1967) (Harlan, J., concurring). An expectation of privacy must be subjectively reasonable and must be one that society would accept as reasonable. Bond v. U.S., 529 U.S. 334, 336-37 (2000); Commonwealth v. Feyenord, 62 Mass.App.Ct. 200, 206-07 (2004).
The federal courts have concluded that, “where inmates have notice that their telephone conversations are monitored and recorded, such monitoring and recording does not violate the Fourth Amendment, because there could be no subjective expectation of privacy that society is prepared to recognize as reasonable." Matter of a Grand Jury Subpoena, 454 Mass. at 688, and cases cited. Similarly, the Supreme Judicial Court has held that monitoring and recording inmate telephone calls does not violate Article 14 of the Massachusetts Declaration of Rights. Id. at 688-89, citing Cacicio, 422 Mass, at 772-73 (“the detainee or inmate could have no subjective expectation of privacy in the recorded conversations that society would be prepared to recognize as reasonable”).
Mr. Chadwick, however, contends that he “has a reasonable expectation that the privacy of his conversations will not be invaded for any illegitimate purpose, or without a warrant, subpoena, court order, or other valid process.” Although Mr. Chadwick acknowledges he may be required to compromise his privacy for legitimate penological purposes, he argues he had no expectation that the Jailhouse Recordings would be shared with Detective Gossom, without some type of legal process. The court disagrees with Mr. Chadwick’s conception of the “reasonable expectation of privacy.”
“(T]he term, a ‘reasonable expectation of privacy,’ refers to privacy as against the world in general. If the parties to a conversation should reasonably anticipate being overheard by anyone, the conversation is not private." Commonwealth v. Fitzpatrick, (Mass.Super. 2008) (Billings, J.) (24 Mass. L. Rptr. 126] (emphasis in original), and cases cited. This is because “a person’s expectation that his spoken words will remain private . . . declinéis] as his control of the listening environment diminishes." Commonwealth v. Eason, 43 Mass.App.Ct. 114, 129 (1997) (Jacobs, J., dissenting), rev’d, 427 Mass. 595 (1998). Mr. Chadwick’s expectation of privacy hinges on whether he could reasonably expect to be overheard.
Mr. Chadwick had notice that his telephone calls, other than those made to his attorney, were subject to monitoring and were recorded. The “Inmate Handbook” informed Mr. Chadwick that his calls would be recorded. The “Inmate Telephone System Number Request Form” sets forth the Sheriffs Department’s procedure for monitoring and recording inmate telephone calls. The pre-recorded message that began each telephone call also notified the participants of the taping and monitoring. Mr. Chadwick discussed the taping with all of the participants with whom he spoke at any length.[10], [11]
Mr. Chadwick knew the Sheriffs Department would be listening to and recording his telephone calls, he reasonably expected the Sheriffs Department would share the Jailhouse Recordings or, as was the case here, would allow the police to listen to recordings of his telephone calls. Mr. Chadwick’s expectation of privacy was not contingent on who was listening to his telephone calls. Once he knew his calls were recorded he “could have no reasonable expectation of privacy in the [Jailhouse Recordings] that society would be prepared to recognize as reasonable.” Id., citing Cacicio, 422 Mass. at 772-73 (internal quotations and citations omitted).
The following language appears dispositive, ." . . where all parties to the recorded telephone calls had notice that their conversations were not private, and where the detainee or inmate had no objectively reasonable expectation of privacy, any privacy interest in those conversations must be given little, if any weight." In the Matter of a Grand Jury Subpoena, 454 Mass. 685, 692-93 (2009). In the Matter of a Grand Jury Subpoena mandates denial of the motion to suppress even when the telephone call recordings were provided on a mere police request. To rule otherwise, would stretch the language “little, if any weight” beyond any reasonable construction.
ORDER
The defendant’s, Jonathan Chadwick’s, motion to suppress (paper #15) is DENIED.

 Mr. Chadwick also moves to suppress: (1) any statements he or other parties made during the Jailhouse Recordings which the Commonwealth may seek to introduce through the testimony of police officers or other witnesses who have heard the Jailhouse Recordings; and (2) any fruits of the Jailhouse Recordings, such as transcripts of the Jailhouse Recordings or evidence obtained as a result of the Jailhouse Recordings.

 Defense counsel indicated his concern that the grand jury presentation distorted the function of the grand jury because the prosecutor did not present to the grand jury the portions of the tape-recorded calls containing his repeated denials of criminal liability. The portion presented to the grand jury included Mr. Chadwick’s explanation of events to hrs grandmother. The court is not persuaded by this argument. Mr. Chadwick’s account to his mother does not substantially depart from what he said elsewhere on the tapes. Without full consideration of the issue, because the parties have not briefed the issue, the court is not persuaded that the failure to provide the grand jury with the repetitious denials is material to the mtegrity of this grand jury presentation.
In the interests of judicial economy, if Mr. Chadwick wishes to file any additional motions related to the telephone tapes, the motions should be directed to this judge prior to *161 scheduling a date for filing or hearing. This would include a so-called Odel motion.

 It is impossible for the court determine with certainty the identity of the persons Mr. Chadwick called. The court adopts the transcriptionist’s spelling of Meaghan and Brittany.

 The court adopts the numbers assigned to each call by the transcriptionist. The court has read the transcripts twice, but has only listened to limited portions of the compact disk of the calls.

 The transcript is incorrect on this issue.

 Commonwealth v. Odgren, 455 Mass. 171 (2008), was decided on October 15, 2009.

 The court rejects any suggestion to the contrary.

 Although no direct evidence was presented on this issue, the court draws this inference from the evidence.

 Massachusetts R.Crim.P. 17(a)(2) states, “(t]he court may direct that books, papers, documents, or objects ... be produced before the court within a reasonable time prior to the trial or . . . when they are to be offered in evidence!,] . . . if authorized by law.” (Emphasis added.)

 For example, in one call, Mr. Chadwick acknowledged the recording policy by stating, “this is all being recorded. But it doesn’t matter — they don’t even listen to this anyways.”

 The conversation with Meaghan’s mother — actually a call to Meaghan — occupies just three pages of the transcript.